# Illinois Official Reports

## Appellate Court

---

### *People v. Richardson*, 2021 IL App (1st) 190821

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW RICHARDSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0821 |
| Filed | June 23, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-16436(02); the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, defendant Andrew Richardson was convicted of two separate counts of aggravated battery based on the striking and burning of Z.W., born October 22, 2008. Richardson and codefendant Caroline Woods were tried separately and simultaneously, with Woods by a jury and defendant by the trial court. The trial court subsequently sentenced defendant to two consecutive terms of 32 years, for an aggregate term of 64 years.

¶ 2    On appeal, defendant argues that he did not knowingly and voluntarily waive his right to be present when the trial court viewed videotaped evidence *in camera* during a pretrial section 115-10 (725 ILCS 5/115-10 (West 2016)) hearing regarding the admissibility of Z.W.'s outcry statements.

¶ 3    In November 2017, prior to trial, the State moved to admit Z.W.'s prior statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (*id.*). Specifically, the State sought to introduce Z.W.'s out-of-court statements to several individuals, including Officer Francis Frye, Officer Jaime Garcia-Okon, Sergeant Troy Williams, Lieutenant Jacob Alderden, Detective Bryan Boeddeker, social worker Gabrielle Aranda, and forensic interviewer Alison Alstott. The motion stated that Z.W. would testify at the trial.

¶ 4    At the hearing on the motion, defendant was present and represented by counsel. At the start of the hearing, the prosecutor informed the trial court that the statements to Lieutenant Alderden and Alstott were interviews recorded on video. The prosecutor proposed that she would lay a foundation for each video and then the court could view the videos on its own time. Defense counsel agreed to this proposal.

¶ 5    Lieutenant Alderden testified that he interviewed Z.W. in an ambulance on October 2, 2016. He interviewed Z.W. with another officer who was present, and that officer's body camera recorded the 15-minute interview. He identified the State's exhibit as the video recording of his interview captured on the other officer's body camera. He stated that the video accurately and fairly reflected his interview with Z.W. Alstott, a forensic interviewer supervisor at Comer Children's Advocacy Center, interviewed Z.W. at Comer Children's Hospital on October 3, 2016. She recorded the interview with a travel camcorder, and she identified the State's exhibit as the video of her forensic interview with Z.W. and stated that it accurately and fairly depicted the interview. The State moved to admit the videos into evidence for purposes of the hearing, which the court allowed. Defense counsel did not object to the admission. The court stated it would review the videos.

¶ 6    The next day following arguments, the court granted the State's motion to introduce Z.W.'s prior statements at defendant's trial. In its ruling, the court noted that it examined both videotaped interviews.

¶ 7    The following evidence was presented at defendant's September 2018 bench trial.

¶ 8    Mason Arion was walking his dog at a park near 4800 South Lake Shore Drive in Chicago at around 10 a.m. on October 2, 2016. He noticed a young male child "sort of jogging" north along Lake Shore Drive. He explained that the child was "sort of jogging" because the child was "sort of limping" and did not appear to be able to run at full speed. He observed the child for a little bit because he did not want to scare him into the road. As he caught up to the child, Arion approached him and asked where he was going and where he was coming from. Arion observed scars and bruises on the child's face, arms, and legs. A minute or two later, a police

officer arrived at the location. Arion did not learn the name of the child. After the officer arrived, he provided his information to the officer and told the officer what he had observed. Arion identified a photograph of the child in open court.

¶ 9        Sergeant Troy Williams was working on October 2, 2016, as a patrol sergeant, in uniform and driving a marked patrol car. His uniform included a body camera. Shortly before 11 a.m., he heard a radio call of an approximately seven-year-old child running northbound on Lake Shore Drive near 47th and 48th Streets. It was not typical for a sergeant to respond to routine calls on the radio, but because of the nature of the call, he went to the scene. He drove to the area near 47th Street and Lake Shore Drive, which had a playground and baseball fields. As he approached the area, Arion raised his hand to get Sergeant Williams's attention. He spoke with Arion and then with the child, whom he identified as Z.W. Sergeant Williams observed facial scars and bruises as well as a limp. He also noted what appeared to be a diaper protruding from Z.W.'s waistband.

¶ 10       Z.W. told Sergeant Williams that he "just wanted to go to the park." The sergeant asked Z.W. about the observed injuries, and Z.W. told him that they were "punishment wounds from his parents." Sergeant Williams asked who his parents were, and Z.W. answered "Caroline," "Carol," and "Richardson." Z.W. showed Sergeant Williams a burnt wound or scar on his back and told him that he had been placed on a stove by his father "Richardson." When the sergeant asked Z.W. where he lived, Z.W. pointed at two buildings south of where they were, 4800 South Chicago Beach Drive.

¶ 11       Sergeant Williams notified the dispatcher that he found the child and called for the fire department because of the child's condition. An ambulance was sent to the scene, and the paramedics examined Z.W. He also spoke with his lieutenant, Jacob Alderden. Officer Frye also arrived at the scene. Sergeant Williams directed the ambulance over to 4800 South Chicago Beach Drive, and he relocated to that location as well to help find out where Z.W. lived. Officer Mandy Tucker also arrived at the scene.

¶ 12       Z.W. initially led the officers into the north building. Officer Tucker's body camera was on and operating at this time, and Sergeant Williams turned on his body camera as well. They went up to the twenty-sixth floor, and Z.W. went to an apartment, turned the knob, and then knocked. No one answered the door. The officers knocked on a couple other doors and determined that Z.W. did not live on that floor. They returned to the lobby. Sergeant Williams spoke with the doorman while Z.W. returned to the ambulance. As he was standing in the lobby, a woman entered with a baby. Sergeant Williams learned her name was Caroline Woods, and he identified her in open court. He had a conversation with Woods in the presence of Officer Tucker, and Woods was placed in custody at the scene. Sergeant Williams estimated that he had been with Z.W. from 20 to 30 minutes before Woods entered the lobby. During his conversation with Woods, she told Sergeant Williams that Z.W. was injured in a car accident and in falling down the stairs. She further told him that defendant treated Z.W. very well.

¶ 13       Officer Frances Frye was working on October 2, 2016, as a uniformed patrol officer in a marked vehicle. Shortly before 11 a.m., the officer heard a call over the police radio of a child running northbound around the 4800 block of South Lake Shore Drive. Officer Frye proceeded to that location and observed Sergeant Troy Williams with a child, Z.W., as well as Arion. He observed that Z.W. "looked battered" and had bruises "all over his body," including on his face and arms. After speaking with Sergeant Williams, Officer Frye tried to locate where Z.W. lived. Z.W. pointed to a building that was part of multiple residential high-rise buildings. He

went into the lobbies of multiple buildings to ask security and the doormen if they knew Z.W. He was unable to locate Z.W.'s residence, but different officers located Z.W.'s building.

¶ 14 Lieutenant Jacob Alderden monitored the call that Sergeant Williams responded to a child running along Lake Shore Drive on October 2, 2016. He spoke with Sergeant Williams and then went to the scene at 4800 South Chicago Beach Drive. He joined Sergeant Williams and other officers on the twenty-sixth floor of the north tower. He observed Z.W. and noticed "obvious injuries to his face." After the attempts to find Z.W.'s apartment were unsuccessful, he relocated to the lobby, and Woods showed up with Z.W.'s sister. Lieutenant Alderden identified Woods in open court. Z.W. was in the ambulance, and Lieutenant Alderden went to speak with him. Z.W. told him that he was routinely beaten by his mother and father. Z.W. started to detail how he sustained the injuries, including which weapons were used. Lieutenant Alderden stopped talking to Z.W. because he directed another sergeant to obtain a search warrant for defendant and Woods's residence. He then resumed a conversation with Z.W. with Officer Garcia-Okon present. Officer Garcia-Okon was wearing a body camera, and the conversation was recorded. Z.W. told the lieutenant that he last attended school for prekindergarten and was enrolled in home school. The recording of the conversation was played during the trial.

¶ 15 During the recorded conversation, Z.W. told the officers that defendant and Woods hit him with a baseball bat, belt, vacuum, and a metal bottle. Defendant burned him by holding him over a hot stove. Z.W. said that he was not fed when defendant was out of town.

¶ 16 Later that evening, around 7:30 p.m., Lieutenant Alderden returned to 4800 South Chicago Beach Drive to execute a search warrant on defendant and Woods's residence with several other officers, including Sergeant Williams and Officer Garcia-Okon. Lieutenant Alderden observed a small closet with a radio, suitcase, three empty cans of okra, two water bottles, a fork, and a hanging cord. The closet also smelled strongly of urine. He also observed a television monitor that was attached to a closed-circuit security system, which included cameras from the closet and the living room. A recording from the body camera of Sergeant Peter Kochanny, who participated in the search warrant execution, was admitted and played.

¶ 17 Officer Jerry Doskocz was employed as an evidence technician with the Chicago Police Department and was assigned to assist in executing the search warrant at 4800 South Chicago Beach Drive. He photographed and inventoried several items from the apartment, including a black wooden baseball bat, a black belt, a hair straightener, a vacuum cleaner with a black attached hose, a metal starch can, and a white power strip. He also photographed the security system throughout the apartment with cameras in the closet and living room, a small television with the camera feed, and a hard drive.

¶ 18 Detective Bryan Boeddeker was assigned to investigate the child abuse of Z.W. on October 2, 2016. He went to Comer Children's Hospital and met with Z.W. in the emergency room with another officer and an evidence technician present. He observed visible injuries on Z.W. During the interview, Z.W. identified defendant from a photograph as his dad.

¶ 19 Z.W. described the abuse he suffered. He told the detective that his mother and father hit him on the feet with a black baseball bat. His father burned him on the kitchen stove. His mother and father beat him about the head and the back of neck with a black belt. Detective Boeddeker observed a bandage on the right side of Z.W.'s face, as well as a sore or an injury to the bridge of his nose and other injuries in different stages of healing and scarring all over his head. Z.W. said he received the injury above his eyebrow when his father hit him with a

metal spray bottle a few weeks earlier. Detective Boeddeker also observed injuries to Z.W.'s genital area, including an injury to the left side of Z.W.'s penis from when defendant burned his penis with a black curling iron. Z.W. told the detective he was injured with multiple items, including a vacuum cleaner hose, electrical cords, a belt, a black baseball bat, the stove, and a black curling iron.

¶ 20    Z.W. also discussed his living situation. He lived with defendant, Woods, and his sister H.W. in an apartment. His parents slept in a bedroom, and a crib for H.W. was kept in the same bedroom. H.W. slept in a closet next to the bathroom. He did not have a bed but slept on the floor. Z.W. stated that he was in the closet all day every day. Z.W. ate canned okra and drank water and protein drinks. Z.W. did not know how often he ate but said it was usually light outside when he was able to eat food. Z.W. was sometimes allowed to use the bathroom, but if he was not let out of the closet, he had to go to the bathroom in the closet.

¶ 21    Z.W. told Detective Boeddeker that on October 2, 2016, he wanted to leave the apartment to tell the police that his mother and father were being mean to him. He knew that his parents were not home. He stated that his mother installed a video camera inside his closet that was pointed at him. Both defendant and Woods showed him their cell phones, which showed images of him from the camera, and Z.W. knew that his parents could watch him at any time.

¶ 22    As part of his investigation, Detective Boeddeker attempted to find defendant. After speaking with someone in Country Club Hills, Illinois, he received a phone number with a Los Angeles area code. He then obtained an arrest warrant for defendant. He subsequently learned that defendant had been arrested on the warrant on October 11, 2016, in Los Angeles. On October 18, 2016, Detective Boeddeker flew to Los Angeles to take custody of defendant and bring him to Illinois. The detective identified defendant in open court.

¶ 23    Alison Alstott was a forensic interviewer supervisor for the Chicago Children's Advocacy Center in October 2016 and was assigned to interview Z.W. on October 3, 2016, at Comer Children's Hospital. During the interview, detectives, an individual from the Department of Children and Family Services (DCFS), and an assistant state's attorney were present behind a curtain to observe. Z.W. was introduced to these individuals and was aware they were listening on the other side of the curtain. No one other than Alstott asked questions during the interview. The interview was recorded and played in court. In the interview, Z.W. discussed his injuries and how they were caused by defendant and Woods. The injuries he described were generally consistent with the description he gave to the police officers.

¶ 24    Gabrielle Aranda works as a social worker at Comer Children's Hospital pediatric emergency room. On October 2, 2016, she was working and met with Z.W. According to Aranda, Z.W. was wearing a soiled diaper held together with duct tape. He had abrasions above his right eyebrow, on the bridge of his nose, on the left side of face, the back of his left ear, and on his back. He also had old scars throughout his entire body.

¶ 25    Z.W. told her he lived with defendant, Woods, and his sister. He said the abrasions on his face occurred when he was struck with a bottle by defendant. Aranda indicated that Z.W. had an open lesion on his back that Z.W. got when defendant placed him on the stove. Z.W. also said defendant burned the back of his ear and his genitals. Z.W. told her that Woods beat him with a pole, which left marks on his body.

¶ 26    Z.W. explained that he left his residence that day for two reasons: he wanted to play in the playground, and he wanted to tell the police that defendant was beating him every day. He told her that the last time he had eaten was lunch the previous day. He said he slept in a closet and

was sometimes allowed to leave to use the restroom, but he was not allowed all the time, which was why he was wearing a diaper. Aranda identified photographs of Z.W. taken while he was in the emergency room. Z.W. told Aranda that defendant and Woods had threatened to throw him out the window and, on numerous occasions, they told him that they wanted him dead.

¶ 27    Dr. Veena Ramaiah is a pediatric emergency room physician and child abuse pediatrician at Comer Children's Hospital. On October 2, 2016, she received a call from the pediatric emergency room social worker informing her about a child with high concerns of abuse or neglect. Dr. Ramaiah examined Z.W. on October 3, 2016. Z.W. was seven years old at the time of the examination. He was walking around and interactive. Dr. Ramaiah identified photographs taken of Z.W. either in her presence or in the emergency room the day before. She described Z.W.'s injuries, both healed to scarred, in the photographs, including on Z.W.'s face, his neck, collarbone, shoulder, chest, abdomen, arms, legs, thighs, groin, and penis. Dr. Ramaiah testified that the burn on Z.W.'s back went through multiple layers of skin. She also stated that tests indicated an issue with Z.W.'s liver but that a computed tomography scan was negative. Dr. Ramaiah stated that the elevated liver enzymes could have indicated an old injury to his liver. A skeletal survey of X-rays of Z.W.'s body was conducted. The X-rays showed that toes on Z.W.'s feet had been broken weeks to months earlier but were healing. The X-ray of Z.W.'s left femur showed healing around a fracture or break of the bone that occurred weeks earlier. According to Dr. Ramaiah, the healing femur could be the cause of Z.W.'s limp. Dr. Ramaiah testified that to break the femur of a seven-year-old child would require "a significant amount of force" because it is a "very thick" and "strong" bone.

¶ 28    When asked if she was able to count the amount of scars and injuries Z.W. had, Dr. Ramaiah responded, "No, there were too many." Dr. Ramaiah's medical diagnosis of Z.W. was physical abuse and being a victim of torture, the first time she had diagnosed torture.

¶ 29    Z.W. testified that he was born on October 22, 2008, and was nine years old at the time of the trial. He was in the fourth grade. He identified defendant and Woods in open court. Z.W. lived with them in three places. He lived in the yellow house from when he was a baby until he was four years old and lived there with Woods and Woods's grandmother. Later, defendant moved in with them. After Woods's grandmother passed away, he moved to the blue house and lived with defendant, Woods, and defendant's father. Z.W. was four years old when they moved to the blue house. Z.W.'s sister H.W. was born when they lived in the blue house. After defendant's father died, they moved from the blue house to an apartment in Chicago when he was six years old.

¶ 30    While he lived in the yellow house, defendant would hurt him by tying him up to a bed, and then defendant hit Z.W. on the back with a baseball bat. Defendant also hit Z.W. with a wire and a belt. No one else hurt him when he lived in the yellow house. Defendant did the same things to hurt Z.W. when they lived in the blue house. No one else hurt him when he lived in the blue house.

¶ 31    In the apartment, Z.W. slept in the closet. The door could be locked, and defendant or Woods would tie Z.W.'s hand behind his back to a rope that was hanging from a metal bar. He was sometimes allowed to use the bathroom. If he was not allowed to use the bathroom, he would try to hold it. He had to wear diapers. He ate okra and water in the closet. There was a camera in the closet so they could "keep an eye on" him.

¶ 32    Defendant hurt Z.W. when they lived in the apartment. Z.W. testified that defendant put his face in the bathtub and toilet with water in it. Defendant also put a bag over his head.

Defendant also picked him up and burned his face and back on the stove. Z.W. stated that he still had a scar on his back from the burn. Z.W.'s genitals were burned by Woods with a hair iron and the stove. Defendant and Woods put tape over his mouth when he tried to talk. Defendant hit Z.W. in the face with a bat while Woods hit his feet with the bat. He was also hit with a can in the head. He indicated that he had a scar above his left eyebrow.

¶ 33    On October 2, 2016, Woods tied Z.W. up to the rope in the closet because she had to go to the store. Defendant was in California. After Woods left with H.W., Z.W. was able to untie the knot and went on the elevator. He went outside and saw that he was one block behind Woods and H.W. He then went to the park, and the man, Arion, with his dog found him and called for help. Before that day, Z.W. had left the apartment one time to go shopping with Woods. He did not attend school and did not go to the doctor.

¶ 34    Ronnie Rush worked as a chief engineer for the Newport Condominiums, located at 4800 South Chicago Beach Drive, in October 2016. He was in charge of heating and cooling as well as fixing plumbing. He identified defendant and Woods in court as residents from the building. He saw Woods almost every morning when she would leave the building around 8 or 9 a.m. with a baby girl in a stroller. He saw defendant less frequently, maybe once or twice a week. The only time he saw defendant and Woods together was in their unit.

¶ 35    In the summer of 2016, Rush was called to their unit to investigate a leak. He entered the unit with defendant after defendant knocked on the unit door. Woods opened the door with H.W. in her arms. Rush observed a little boy on the couch. This was the first time Rush had seen the little boy. He identified Z.W. from a photograph in court as the little boy he observed. Rush noticed marks on Z.W.'s face, neck, and a little bit of his chest. Defendant sat on the couch very close to Z.W. Rush also noticed that Z.W. was holding a dog shock collar, which he described as black with little prongs coming out of it. Rush did not contact the police or building management about Z.W. because defendant told him Z.W. was Woods's nephew that he had picked up because an aunt was sexually abusing the boy.

¶ 36    While he was inside the unit, Rush observed lots of cameras and a closet that was set for "sleeping quarters," with a pillow and a blanket on the floor. He also saw a strap hanging from the clothes rod. Rush had his lunch with him when he went into the apartment. Z.W.'s eyes "got like really big like he wanted some," so Rush then shared his juice and sandwich with Z.W.

¶ 37    On October 2, 2016, Rush received a call that there was a lost boy in the lobby and they were trying to find his unit. He went to the lobby, and as he was entering, he saw Woods coming in at the same time. He also saw Z.W. with the police.

¶ 38    Marsha Byndom lived in the condominium building located at 4800 South Chicago Beach Drive in Chicago during 2015 and 2016. There are two towers, a south tower and a north tower, attached by a lobby. She resided in the south tower. Byndom identified defendant and codefendant Woods as residents of the building in 2015 and 2016. She observed Woods walking down the street, pushing a stroller with a little girl, and looking at her phone. She did not see any other children with Woods. Byndom saw Woods "every day or so" but never saw another child with Woods. Byndom would see Woods and the little girl while she was downstairs smoking. Byndom met defendant when she first moved into the building and he asked if she wanted him to be her personal trainer, but she declined. Defendant continued to ask, but she kept declining. She saw defendant three or four times a week either coming into the building or on the rooftop deck.

¶ 39    In January 2017, Byndom went to the police station and gave a statement. She also identified both defendant and codefendant Woods from photo arrays. Byndom never saw Z.W. while she resided in the building.

¶ 40    After the State rested, defendant moved for a directed finding, which the trial court denied.

¶ 41    Jennifer Brooks-Richardson testified for the defense. She resided in California and was married to defendant, whom she identified in court. She met defendant in January 2014 through Facebook. At that time, she was living in Florida, and defendant lived in Chicago. She began a relationship with defendant and first met in person in August 2015 in Florida. Defendant then started visiting her a couple times a month for a week or so. In October 2015, they got married. Defendant would then visit her a week to two weeks, depending on his routine. She estimated he spent at least 20 days a month with her in Florida. Defendant continued to spend at least 20 days a month with her until October 2016. She moved to California in February 2016.

¶ 42    According to Brooks-Richardson, defendant had to go back to Chicago to deal with his father's estate as well as his personal training clients. Defendant also went to visit his daughter. Defendant would stay in Chicago five to seven days at a time, but it varied. She thought the last time defendant had been in Chicago prior to his arrest was September 20, 2016. She was never in the apartment in Chicago and had never met Z.W.

¶ 43    The defense then rested. Following closing arguments, the trial court found defendant guilty of four counts of aggravated battery of a child and that the offenses were accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. In October 2018, defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial and argued that the court erred in denying his motion for a directed finding, that defendant was not proved guilty beyond a reasonable doubt, and that the State failed to prove exceptionally brutal or heinous behavior indicative of wanton cruelty beyond a reasonable doubt. In February 2019, the trial court denied defendant's posttrial motion. The court merged the counts of aggravated battery of a child based on great bodily harm into the counts of aggravated battery of a child based on permanent disfigurement. The court then sentenced defendant to two consecutive terms of 32 years, for an aggregate term of 64 years in prison.

¶ 44    This appeal followed.

¶ 45    On appeal, defendant argues that he did not knowingly and voluntarily waive his constitutional right to be present for the entirety of the section 115-10 (725 ILCS 5/115-10 (West 2016)) hearing regarding the admissibility of Z.W.'s prior statements. Specifically, defendant contends that the trial court's *in camera* viewing of the two videotaped interviews was plain error because it was a critical stage of the proceedings and he had a constitutional right to be present, which he did not affirmatively waive.

¶ 46    Defendant concedes that he did not preserve this issue on appeal but asks this court to review it as plain error. To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). However, defendant asks this court to review the issue under the plain error doctrine or, in the alternative, ineffective assistance of trial counsel.

¶ 47    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to

the attention of the trial court." The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Id.*

¶ 48    Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that his claim falls under the second prong because his right to be present affected a substantial right. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 49    Under both the United States and Illinois Constitutions, criminal defendants possess the general right to be present, not only at trial but at all critical stages of the proceedings from arraignment to sentencing. *People v. Stroud*, 208 Ill. 2d 398, 404 (2004). However, "[t]he right to be present, even at a critical stage of the proceedings, is not absolute." *People v. Lindsey*, 201 Ill. 2d 45, 56 (2002). A defendant "is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *People v. Lofton*, 194 Ill. 2d 40, 67 (2000) (citing *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). In contrast, a defendant's presence is not required " 'when [his] presence would be useless, or the benefit but a shadow.' " *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934)).

¶ 50    "Under the due process clause of the fourteenth amendment, a criminal defendant's right of presence is violated only when his absence results in the denial of a fair and just trial." *Id.* "The question is not whether 'but for' the outcome of the proceeding the defendant would have avoided conviction but whether the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges." *Id.* Thus, "even where a defendant has the general right to be present because the proceeding is a 'critical' stage, a defendant's absence is not a *per se* constitutional violation. Rather, a defendant's absence from such a proceeding will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Lindsey*, 201 Ill. 2d at 57.

¶ 51    In *Lofton*, the supreme court found that a section 115-10 hearing involves a critical stage of the criminal proceedings. See *Lofton*, 194 Ill. 2d at 69-73. There, the defendant was not present for the hearing, and his attorney waived his presence. During the hearing, the trial court heard testimony from multiple witnesses regarding the minor victim's outcry statements, including from the victim herself. *Id.* at 69-70. Based on the record, the *Lofton* court concluded that the defendant's "presence at the section 115-10 hearing would have been useful in ensuring a more reliable determination as to the admissibility" of the victim's statements and "would have contributed to his opportunity to defend himself against the charges lodged

against him." *Id.* at 72. In reaching this conclusion, the court observed that numerous details, potentially adverse to the State, were elicited at trial regarding the victim's accusation of the defendant but that none of these details were raised during the section 115-10 hearing, when the defendant was not present. The court found that the "record suggests that defendant's presence at the section 115-10 hearing would have contributed to his ability to defend himself against the charges, so that his 'privilege of presence' would not have been 'useless, or the benefit but a shadow.' " *Id.* at 71-72 (quoting *Snyder*, 291 U.S. at 106-07).

¶ 52    Defendant also relies on the decision in *People v. Lucas*, 2019 IL App (1st) 160501, for support. In that case, the trial court viewed a video of the defendant's traffic stop in chambers with defense counsel and the prosecutor, but the defendant was absent. *Id.* ¶¶ 5-6. The appellate court concluded the defendant's "absence from the video viewing affected the trial's fairness because she was unable to view the evidence against her and aid in her own defense." *Id.* ¶ 14. Neither the trial court nor defense counsel informed the defendant that she had a right to be present during the presentation of the video evidence but merely told her that she would not be present. *Id.* The reviewing court concluded that the defendant did not meaningfully waive her right to be present. *Id.* The *Lucas* court found that the presentation of evidence at trial was a critical stage of the proceedings, the video involved a significant portion of the evidence against the defendant, the trial court relied on the video in finding the defendant guilty, and nothing in the record showed the defendant had viewed the video. *Id.* ¶ 15. Further, the court recognized that the defendant's absence impacted her right to testify in her own defense because, in order to reach her decision, the defendant "must be aware of *all* of the State's evidence." (Emphasis in original.) *Id.* ¶ 19. The reviewing court held that the defendant's right to be present "had a cascading impact on fundamental rights" and amounted to plain error under the second prong. *Id.* ¶ 21.

¶ 53    The circumstances of the present case are readily distinguishable from both *Lofton* and *Lucas*. Unlike in *Lofton*, it is uncontested that defendant was present in court for the section 115-10 hearing, including the testimony of multiple live witnesses. Following the State's proposal and the agreement of defense counsel, the trial court viewed the videotaped interviews conducted by Lieutenant Alderden and Alstott with Z.W. *in camera*. And contrary to *Lucas*, defendant was present at trial when both of these videotaped interviews were played during the respective testimony of Lieutenant Alderden and Alstott, and both witnesses were subject to cross-examination. Thus, unlike the defendant in *Lucas*, defendant was able to view all of the State's evidence against him at trial, and his decision regarding his right to testify was not impacted.

¶ 54    Defendant argues that watching the trial court "receive" the evidence of Z.W.'s recorded statements would have been valuable for defendant to communicate with defense counsel during the hearing and in preparation of arguments on the motion. He also contends that he would have benefitted from seeing the trial court's reaction to the video evidence to enhance his ability to exercise his fundamental rights. We are not persuaded. In *Lofton*, the defendant was not present for any portion of the section 115-10 hearing, and the supreme court was not asked to consider the issue before us now. Significantly, in reaching its conclusion, the supreme court specifically made its ruling based on the record of that case. Thus, each case should be considered on its own record. In contrast with *Lofton*, nothing in the record suggests that defendant's presence while the trial court reviewed the recorded interviews would have impacted his ability to defend himself, such that the benefit of his presence was just a shadow.

While defendant offers vague claims of how his right to be present was affected, he has not offered any specific examples of how his presence would have affected his trial.

¶ 55     We find the decision in *People v. Young*, 2013 IL App (4th) 120228, analogous to the facts before us. In *Young*, the defendant was charged with aggravated criminal sexual abuse, and the State sought to admit the minor victims' out-of-court statements under section 115-10. The defendant was present at the section 115-10 hearing when the witnesses testified about the victims' statements. The State also sought to admit DVD interviews of the children and suggested that the trial court view the DVDs at its leisure. *Id.* ¶ 7. Defense counsel did not object to the court viewing the DVDs in chambers but requested the opportunity to argue. At the conclusion of the hearing, the court indicated that it had viewed the recorded interviews and found the statements admissible under section 115-10. *Id.* ¶ 8.

¶ 56     On appeal, the defendant argued that the trial court violated his constitutional right to be present during the critical stages of his trial when the trial court viewed the DVD recordings of the victims' interviews outside of his presence. *Id.* ¶ 21. The Fourth District first observed that the defendant had affirmatively waived this issue when his trial counsel acquiesced to the State's suggestion that the trial court review the DVDs in chambers. The reviewing court rejected the defendant's contention that counsel could not waive his right to be present and found that the trial court's review of the recorded interviews was not a critical stage in the trial. *Id.* ¶ 22.

¶ 57     The *Young* court recognized that the defendant had the right to be present for the section 115-10 hearing and, indeed, was present for the hearing. As in the present case, defendant contended that he had the right to be present when the trial court viewed the recorded interviews of the victims. *Id.* ¶ 24. The reviewing court found that the defendant was present for the critical portion of the hearing.

> "The problem with defendant's position in this regard is that his presence during the viewing of those DVDs would have been useless because defendant's presence would not have contributed to his opportunity to defend himself against the charges. Defendant was present for the proceedings leading up to the review of the DVDs and was later present for his counsel's arguments related to whether the statements from those DVDs should be admitted. Defendant's not being present while the court watched and listened to those DVDs did not amount to an absence from a critical stage of the proceedings. In short, the court's watching and listening to the DVDs was not a 'critical stage' of defendant's trial. The critical stage here was the portion of the section 115-10 hearing that provided defendant the opportunity to defend his position that the statements from those DVDs were inadmissible." *Id.*

¶ 58     Accordingly, the Fourth District concluded that, since the court's review of the DVDs was not a critical portion of the hearing, the defendant affirmatively waived his claim that the court erred. *Id.* ¶ 25. "Counsel's waiver is effective, of course, because it did not involve a waiver [of] a fundamental right." *Id.* The court held that the defendant was present for all critical portions of his trial and, thus, was bound by his counsel's waiver. *Id.* ¶ 26.

¶ 59     We find the analysis in *Young* to be well reasoned and applicable to the present case. We further note that the reviewing court in *Lucas* recognized the different stages in the trial in its facts compared to those present in *Young*, where "the defendant was excluded from the video viewing for the purposes of establishing its admissibility at trial, not from viewing its actual offer as substantive evidence." *Lucas*, 2019 IL App (1st) 160501, ¶ 18. "Critically, the

defendant's inability to view the video at the evidentiary hearing 'would not have contributed to his opportunity to defend himself against the charges.' " *Id.* (quoting *Young*, 2013 IL App (4th) 120228, ¶ 24). We agree and find that the trial court's viewing of the recorded interviews in chambers did not affect defendant's ability to defend himself. We point out that multiple witnesses testified about the abuse suffered by Z.W. at trial, including Sergeant Williams, Aranda, Doctor Ramaiah, and Z.W. himself. The recorded interviews with Lieutenant Alderden and Alstott were not the only the evidence of defendant's abuse and torture of Z.W. Thus, we find that the trial court's viewing of the recorded interviews did not constitute a critical stage of defendant's trial.

¶ 60    Recent decisions in the appellate court have similarly found that a trial court's viewing recorded evidence in chambers did not violate a defendant's constitutional right to be present. See *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 52 (reviewing court could not find that the defendant's presence when the trial court viewed a video of the traffic stop would have contributed to the fairness of the proceedings); *People v. Myles*, 2020 IL App (4th) 180652, ¶ 65 (finding that the "defendant's presence at the video viewing would not have contributed to his opportunity to defend himself against the charges where he had no objection to the court viewing the videos outside of his presence, he saw the videos himself, the witnesses in the videos testified in open court where defendant had the opportunity to confront and cross-examine them, and defendant was aware of all the State's evidence when he decided to testify in his own defense); *People v. Martinez*, 2021 IL App (1st) 172097, ¶ 67 (concluding that, since the "defendant viewed the [interview] and was aware of the contents thereof prior to deciding to exercise his right to testify in his own defense, there is no evidence that circuit court's private viewing of the [interview] video prevented him from assisting in his own defense or from making a fully informed decision to exercise his right [to] testify").

¶ 61    As in *Young*, since defendant's claim does not involve a critical stage of his trial, defendant affirmatively waived his right to be present when the trial court viewed the interviews. Defense counsel agreed to the State's proposal for the court to watch the interviews in chambers and defendant is bound by his counsel's waiver because counsel's decision did not involve a fundamental right. See *Young*, 2013 IL App (4th) 120228, ¶ 25 ("Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial." (Internal quotation marks omitted.)). Defendant's plain error argument fails because his right to be present was not violated because the viewing of the recorded interviews was not a critical stage of his trial and he affirmatively waived his presence. See *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 54 (the plain error doctrine does not apply when the defendant affirmative acquiesces to the trial court's action).

¶ 62    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 63    Affirmed.