2022 IL App (1st) 200315

FIRST DISTRICT
SIXTH DIVISION
May 27, 2022

No. 1-20-0315

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 15081 |
| | ) | |
| WILIALDO RODRIGUEZ, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Wilialdo Rodriguez was convicted of predatory criminal sexual assault and aggravated criminal sexual abuse and sentenced to consecutive prison terms of seven and three years. On appeal, defendant contends that the trial court erred when it failed to ascertain from potential jurors that they understood and accepted his right to not present evidence, as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). He also contends that the court erred by viewing a recording of the complainant's victim-sensitive interview (see 725 ILCS 5/115-10 (West 2018)) outside defendant's presence without first obtaining his waiver of his right to be present and by admitting the interview into evidence without publishing it. Lastly, defendant contends that trial counsel rendered ineffective assistance by not filing and arguing a motion to suppress his postarrest statements. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3     On August 1, 2019, a jury found defendant guilty of predatory criminal sexual assault and aggravated criminal sexual abuse. The court sentenced him to a total of 10 years' imprisonment on November 25, 2019, issued the mittimus on December 23, 2019, and corrected the mittimus to account for presentencing detention credit on January 2, 2020. On defendant's February 18, 2020, motion in this court, we granted him leave to file a late notice of appeal, which he filed. This court has jurisdiction in this matter, pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606(c) (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case, including extension of the time to file a notice of appeal.

¶ 4                                    II. BACKGROUND

¶ 5     Following his August 2015 arrest, defendant was charged with predatory criminal sexual assault and aggravated criminal sexual abuse of A.P. between October 1 and November 30, 2014, when she was under 13 years old and he was at least 17 years old. The former consisted of defendant inserting his finger into A.P.'s "sex organ," and the latter consisted of defendant touching A.P.'s breast with his hand for the sexual arousal or gratification of himself or A.P.

¶ 6     In December 2015, the court ordered a behavioral clinical examination (BCX) of defendant's fitness to stand trial. In January 2016, a psychologist of the court's Forensic Clinical Services reported to the court that she examined defendant in December 2015 and opined that he was fit to stand trial, as he was "not manifesting symptoms of a psychiatric condition that would preclude his fitness" and was aware of the charges against him and the nature of the legal proceedings. He understood the roles of various courtroom personnel and was "capable of assisting

in his defense, if he so chooses." He was not prescribed any psychotropic medication at that time. The psychologist reported that she could not opine as to defendant's ability to understand *Miranda* warnings at his arrest "due to his lack of cooperation with this portion of the evaluation."

¶ 7                    A. Admission of A.P.'s Statements

¶ 8     In June 2016, the State filed a motion for a hearing on the admissibility of statements by A.P. under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2018)). Specifically, the State sought to admit A.P.'s "outcry to family members" Alondra, Alejandra, and Melissa and to Dr. Yesenia Castro-Caballero, as well as her forensic interview by Marilyn Soto and trial testimony. The statements to family members that defendant inserted his finger in A.P.'s vagina were documented in police reports, and the forensic interview to the effect that defendant inserted his finger in her vagina and touched her breasts was videorecorded.

¶ 9     Also in June 2016, the court granted a request by defense counsel to order that he be allowed to bring a laptop computer into jail "so we can review videos with" defendant.

¶ 10    The defense did not respond in writing to the State's section 115-10 motion.

¶ 11    In January 2017, the State told the court that it inadvertently omitted A.P.'s mother as an outcry witness in its section 115-10 motion and had since notified the defense of its intent to add her to the motion. The court granted the State leave to amend the motion on its face.

¶ 12    A hearing was held on the motion in February 2017. The court stated for the record at the beginning of the hearing that defendant was present, as well as his counsel and the State, and that the court had "reviewed the forensic interview."

¶ 13    Alondra testified that she and Alejandra are twins and were 14 years old as of the hearing, Melissa is their younger sister, they are all the daughters of defendant and Nelida Santana, and

A.P. is their cousin. Her family had a party on Halloween 2014, with Alondra's parents hosting and cousins and friends attending, after which A.P. slept over in Melissa's bedroom. A.P. seemed to enjoy the party. At some point in the night, she came into the bedroom shared by Alondra and Alejandra and awakened Alondra. A.P. seemed "scared" but was not crying. She said that Alondra's father, defendant, had touched her. She did not provide any details, and both Alondra and Alejandra told her to go back to sleep. A.P. said that she may have been dreaming. She stayed in the bedroom with Alondra and Alejandra and went home the next day. Alondra did not press A.P. for details about her statement but "just left it."

¶ 14    On cross-examination, Alondra testified that A.P.'s younger brother, Erik, did not attend the Halloween party. Alondra and the others went to sleep late that night, at about 9 or 10 p.m., because they cleaned up after the party. A.P. never mentioned or discussed bad dreams with Alondra before that night. Until the next morning, nobody left the bedroom after A.P. came in. When asked if A.P. "had any strong feelings good or bad about" defendant before that night, Alondra replied that "our family was really close, so like we all liked each other."

¶ 15    On redirect examination, Alondra testified that she saw A.P. frequently at school and at family parties. They were friends and had discussed private matters. Defendant was A.P.'s godfather, and Alondra believed that A.P. and defendant had a good relationship until that night.

¶ 16    Alejandra testified that A.P. is her younger cousin, who she knew her "whole life." They had a good relationship, attending the same school and going to family parties. Her family had a party on Halloween 2014 with Alejandra's parents hosting and friends and A.P. attending, after which A.P. slept over in Melissa's bedroom. At some point in the night, A.P. came into Alejandra and Alondra's bedroom and awakened Alejandra with her crying. She had seemed happy and had

not been crying earlier that night. A.P. explained to Alejandra and Alondra why she was crying: defendant had touched her. She did not give any details. Alejandra told her it was a dream, or possibly Alondra said so, but A.P. herself did not say it had been a dream. Alejandra told A.P. to go back to sleep, which she did in Alejandra and Alondra's bedroom, and Alejandra went back to sleep. "We didn't br[ing] it up ever since," except that Alejandra discussed it with Alondra after that night. Before that night, Alejandra and A.P. had discussed social matters "sometimes" but did not "really" discuss secrets or private matters.

¶ 17    On cross-examination, Alejandra testified that A.P.'s brother did not attend the party or sleep in Alejandra and Alondra's bedroom that night. A.P. did not seem scared during the Halloween party and they went to bed about 10:30 p.m. Alejandra did not recall A.P. mentioning bad dreams before that night. A.P. had liked defendant as her godfather. After A.P. said that defendant had touched her, Alondra left the bedroom to see if he was awake or asleep.

¶ 18    Sandra Santana, A.P.'s mother, testified that A.P. was born in October 2005, defendant was her godfather, and they had gotten along well. In April 2015, Sandra was playing with A.P. When Sandra tickled her, she asked Sandra not to touch her body. Sandra said "I told you *** not to let your uncles *** touch you." A.P. cried and said she had something to tell. Sandra asked what it was, and A.P. replied that "my uncle Willie touched me." She was still crying. She added that defendant touched her in his home, in Melissa's bedroom, when she slept over for Halloween. He got into bed with her, removed her bra, and touched her breast and then her vagina. While she pretended to sleep, "it was hurting a lot." She then went to the bedroom of defendant's twin daughters, where she reported that defendant touched her and they told her that she had been dreaming and took her to bed with them. When A.P. recounted this to Sandra, she pointed to her

breasts and vaginal area. A.P. was not in trouble for anything when she reported this to Sandra. Sandra took A.P. to a physician, who asked A.P. if anyone had touched her. She replied "yes," added that "her godfather had grabbed her," and gave the same details she gave Sandra.

¶ 19    On cross-examination, Sandra testified that she got along well with defendant and believed him to be a good father before A.P.'s report. She had told A.P. repeatedly before her report that "no one should ever touch her in her private parts." Sandra did not recall her son Erik attending the Halloween party. When Sandra picked up A.P. on the morning after the party, she did not notice anything unusual in A.P.'s behavior. A.P. did not complain of pain at that time or in the month thereafter. When A.P. told her in April 2015 that defendant had touched her, Sandra took A.P. to the physician the same day. She had been complaining of pain in her vagina before that day, to the degree that Sandra kept her home from school twice but had not taken her to a physician. A.P. was receiving her school report card on the day she reported defendant's actions, and Sandra and A.P. received the report card before they went to the physician. She could not recall A.P.'s exact grades but recalled they were "good grades" and that no teacher had a complaint about A.P.

¶ 20    On redirect examination, Sandra testified that she asked A.P. why she did not report the incident earlier, and A.P. had replied that she was scared.

¶ 21    The State requested that the court admit the video of A.P.'s interview, which the court "has already seen." The State noted that it would not seek to admit Dr. Castro-Caballero's account under section 115-10 but as information gathered to form a medical diagnosis.

¶ 22    The court denied a defense motion for a directed finding. During closing arguments, the court noted that the outcry to Alondra and Alejandra on the night of the alleged incident seemed spontaneous but the report to Sandra months later was less so. The State clarified that it was not

going to elicit at trial from Sandra what she heard A.P. tell the physician but did so in the hearing to show consistency, one of the criteria under section 115-10. The court noted that Sandra characterized A.P.'s report as defendant "grabbing" her while A.P.'s other statements were that defendant "touched" her. The State argued that there would be some inconsistencies between accounts but the purpose of the section 115-10 hearing was to determine overall reliability. The court noted that there was some evidence Alejandra was asleep and asked the State to address the prospect that she was merely reciting what Alondra had said. The State argued that both Alondra and Alejandra testified confidently and candidly and should be considered credible.

¶ 23    Following arguments, the court granted the section 115-10 motion in part and denied it in part. Specifically, A.P.'s outcry to Alondra on October 31, 2014, and to Sandra in April 2015 would be admitted, as would A.P.'s interview. Alejandra's testimony would be excluded because A.P. said in her interview that Alejandra was asleep and she spoke with Alondra only, and Sandra would not be allowed to testify to what she heard A.P. tell the physician.

¶ 24                     B. Motion to Suppress Statements

¶ 25    Defense counsel filed a motion to suppress statements, seeking to exclude defendant's statements made on August 17 and 18, 2015, in post-arrest police interrogation. The defense alleged that he was not properly advised of his rights to remain silent and to consult an attorney. It also alleged that his statements were obtained by "psychological and mental coercion" and by "direct and indirect promises and threats" that rendered his statements involuntary.

¶ 26    Counsel later amended the motion to add specific allegations that defendant had denied the allegations against him through "the majority of the interrogation" but then "Detective Torres'

harassing and coercive interrogation tactics throughout the" interrogation "psychologically intimidated the Defendant" and "created a coercive environment" so that his will was overcome.

¶ 27    The motion was continued repeatedly to allow for the preparation of an English transcript of defendant's interview in Spanish. After the transcript was prepared and distributed to the parties, there was no further mention of the motion to suppress.

¶ 28                                    C. Other Pretrial Proceedings

¶ 29    A pretrial investigation was ordered, and the pretrial investigation report (PTI) from February 2018 states that defendant was born in 1968, was married and had three daughters, no prior convictions, a "normal but poor" childhood raised by both parents, education to the sixth grade, and a history of being employed. The PTI indicated that he was in good physical health, with defendant denying that he was taking any medication or receiving any medical care and describing his pre-arrest leisure activities as "running and walking for exercise," going "to the park with his kids[,] and play[ing] soccer with his friends." He had been diagnosed with depression a few months before his arrest, for which he was seeing a mental health professional and receiving medication. Defendant admitted to social drinking and denied using illegal drugs.

¶ 30    After a change of defense counsel, new counsel told the court in January 2019 that defendant "would like to see—I guess his other attorneys never showed him the videos, one is his and the other is" A.P.'s interview. The court responded that counsel "can take the videos to the jail and show them to him" as "he is entitled to know what the State's case is against him."

¶ 31    Later that month, counsel told the court that his associate brought both videos to jail and played them for defendant, who said he could not understand A.P.'s interview in English and wanted a Spanish translation. The court replied that defendant was "entitled to a transcript of what

was said" but then suggested that counsel "take the video, play it line by line and interpret for him if that's what's necessary so he has a full understanding of what they are saying." The court ordered the sheriff to allow defense counsel to bring a laptop computer and interpreter into the jail "to view the evidence on the videos" and continued the case into February 2019 to allow counsel the opportunity to do that.

¶ 32    During a March 2019 proceeding, in seeking court permission to visit his aging mother, defendant addressed the court in English at some length, including saying "I understand English." Counsel told the court in the same proceeding that he "sent my attorneys with a Spanish interpreter to Spanish to English [*sic*] videos. You allowed viewing of the videos, both [A.P.'s] and his."

¶ 33                                   D. Motion *in Limine*

¶ 34    The State's motion *in limine* sought to bar the defense from arguing constitutional issues, including probable cause and the voluntariness of defendant's statement. The court granted the State's motion regarding probable cause but denied it regarding the circumstances of defendant's arrest and statement because evidence regarding the voluntariness of a statement goes to its weight.

¶ 35    The State's motion conceded that "portions of the defendant's interviews may not be relevant and could be seen as prejudicial" so that the State would not introduce his statements regarding "hitting his daughters or about his daughters being taken by DCFS due to this case." That said, the State sought to introduce recordings of defendant being advised of his *Miranda* rights, admitting to inserting his finger into A.P.'s vagina, and being offered "water and other necessities" at the end of the interview.

¶ 36    In the hearing *in limine*, the defense argued that the jury should hear defendant's entire statement, including his initial denials of wrongdoing. The State argued that it should not have to

"play the hours and hours" of defendant's initial denials. The court ruled that the defense could elicit that defendant "was arrested on the 17th. He was interrogated on the 17th. And the first time he made any inculpatory *** statements is on the 18th."

¶ 37 The defense also argued that evidence defendant was threatened during his interviews with losing his daughters should be admissible as relevant to the voluntariness of his statement. Counsel clarified that he wanted to exclude evidence that defendant's children were taken into the custody of the Department of Children and Family Services (Department) but admit evidence that he was threatened in his interview that the Department could take his children. The State argued that such issues should have been litigated in a motion to suppress, and the defense responded that the voluntariness of defendant's statement was properly at issue at trial.

¶ 38 The State told the court that defendant was questioned for about 2 hours and 15 minutes, total, over the two days following his arrest and made no incriminatory statement on the day of his arrest. The State reiterated that it was not seeking to admit all his interviews but only about ten minutes of video including *Miranda* warnings, his inculpatory admissions, and the final questions about his treatment in custody. To avoid issues of undue prejudice, it was not including references in the first day's interview to the prearrest matter regarding the Department and defendant allegedly striking his daughters. The State argued that the Department case regarding defendant's children was separate from the case regarding A.P., and the detectives did not suggest to defendant that he would improve his position in the former by discussing the latter. The State argued "that there is no good faith basis put forward that argument that he was pressured into confessing because of an unrelated DCFS matter" and that no motion to suppress had been filed raising such

allegations. In anticipation that it would introduce video of the inculpatory statements but not all the questioning, the State had English captioning added to the former but not the latter.

¶ 39    The court stated that it would not admit evidence of other crimes, explaining that it meant defendant's references to striking his daughters. The State sought to include defendant's reference to a bribe as evidence of consciousness of guilt. Over a defense argument that the reference to a bribe was also other-crimes evidence, the court agreed with the State.

¶ 40    The court asked if there was some available video of defendant's denials without reference to the Department matter so the jury could see that he denied the allegations before admitting them. The State replied that some of the prepared video included denials but also references to the Department matter. The State said it could edit the video but suggested a stipulation that defendant denied touching A.P. in over an hour of questioning before making his admission.

¶ 41    The defense noted that there was a transcript of all of defendant's questioning and suggested providing that to the jury rather than a stipulation or detective testimony to defendant's denials on the day of his arrest. The court asked the parties if they could stipulate to relevant portions of the transcript for completeness. The State said that it could redact the transcript and argued that a redacted transcript and a video including denials would be complete as it would show context for the later admission. The defense noted that the denials on the day of defendant's arrest were longer than the denials on the second day included in the edited video, arguing that one of the detectives at the interview could authenticate or establish a foundation for the transcript of the first day's interview. The State agreed to do so.

¶ 42    The court asked to see video of the first day's interview, and it was shown in court. The defense argued that reading the transcript would be faster than showing the video, and the State

responded that the jury should see the video because even jurors who cannot speak Spanish could see the demeanor and tone of the detectives and defendant. The court found that it would be insufficient for the jury to hear only the second day's denials and not the denials on the day of arrest. It held that "to be fair to both sides the entire transcript should come in [and] the entire video should be played now that we realize we have this entire video transcribed minus references to the other bad acts and or other crimes," except that the bribery reference would not be removed. The court would not exclude defendant's mention of his fear of being struck, which the defense argued colored his perception of the questioning, even though the detectives did not strike him.

¶ 43                                    E. *Voir Dire*

¶ 44    During *voir dire*, the court inquired of the venire members if they understood and accepted various principles. In relevant part, the court told the venire:

> "A person accused of a crime is presumed to be innocent of the charges against them. That presumption remains with the defendant throughout every stage of the trial and during your deliberations upon your verdicts. It is not overcome unless you are convinced by the evidence that comes from this witness stand that the defendant is guilty beyond a reasonable doubt; ***
>
> The State has the burden of proving the defendant guilty beyond a reasonable doubt. This burden remains with the State throughout the trial; ***
>
> The defendant is not required to prove his innocence; *** [and]
>
> The defendant has the absolute right to remain silent. The defendant can elect to sit there and not testify. He can rely on the presumption of innocence. You may not draw any

inference from the fact that the defendant chooses to remain silent either in favor of or against defendant because he elects to remain silent."

After reading each of these principles, the court asked the venire, "Does everyone understand and accept this principle of law?" Each time, the court told the venire members to raise a hand if they did not and spread of record that nobody raised a hand.

¶ 45                                F. Trial Evidence

¶ 46    At the mid-2019 trial, defendant had Spanish translation via earphones.

¶ 47                                    1. A.P.

¶ 48    A.P. testified that she was born in 2005 so that she was nine years old on Halloween 2014 when she and her brother, Erik, went to the home of her aunt, defendant, and her cousins Alondra, Alejandra, and Melissa to attend a "haunted house" party. Alondra and Alejandra are twins and older than A.P., while Melissa is A.P.'s age. Defendant was her godfather, and she identified him at trial. After the Halloween party, A.P. and Erik slept over at their aunt's home, Erik in the twins' bedroom and A.P. with Melissa. Melissa and A.P. shared one bed, and Melissa fell asleep first. A.P. heard defendant turn off the television in the living room, then saw him enter the bedroom with her. He laid on the bed next to A.P. and pulled down her pajama pants and underwear. She was shocked, and neither he nor she said anything. He touched her vagina "in a circular motion" with his fingers before pushing them in further and causing her pain. She felt his fingernails. After a couple of minutes, he pulled up her underwear and pants. She began to cry, but he continued, lifting her pajama top and bra and "squishing my breast" for a few seconds before getting out of bed and leaving the room. He had said nothing throughout, and she said nothing to him because she was scared and shocked.

¶ 49     A.P. then went to the twins' bedroom, finding them asleep. Alondra woke up, and A.P. told her that her father had touched A.P. She replied that it was not true and that A.P. had been dreaming. Alejandra was still asleep. A.P. stayed in the twins' bedroom because she felt safer there, but she did not sleep because she was still upset. The next morning, A.P. did not tell any adult what had happened because she was still scared. Indeed, A.P. did not mention it again until April 2015, when she and her mother were tickling each other. "She touched me like where he touched me and I started to cry." Her mother asked A.P. what was wrong, and A.P. told her what had happened. Her mother cried and was angry, and she took her to "Dr. Yesenia," whom A.P. also told what had happened on Halloween 2014. About a month later, A.P. went to the "Child Advocacy Center" to be interviewed about what happened on Halloween 2014, and the interview was videorecorded. She had watched that video before trial. She had not seen defendant between the incident and trial.

¶ 50     On cross-examination, A.P. testified that she had slept at defendant's home in Melissa's bed before the incident. A.P. was sleeping at the foot of the bed when defendant came in and lay down on the bed next to her, and there was enough room for him to do so, despite Melissa also being in the bed. While defendant's actions "really hurt" her, A.P. did not scream or tell defendant to stop. A.P. was afraid during the incident, but defendant never threatened her or told her to remain silent. A.P. did not wake up Melissa during or after the incident but went directly to the twins' bedroom, where she told Alondra that defendant touched her "inappropriately" and that he touched her breast as well as her vagina. Alondra said it was not true and she must have dreamt it, and Alejandra never woke up. A.P. acknowledged that she may have said that she was unsure it happened. She joined the twins and her brother in the bed. A.P. did not mention the incident again

until she told her mother. Her mother took her to a physician for her vaginal pain, and A.P. told Dr. Yesenia that she had vaginal pain for about a week. Dr. Yesenia, who she saw the first time that day, asked her about the incident. When she asked if defendant had "done anything" with his penis, A.P. told her "no." A.P. told Dr. Yesenia that she had told only the twins. She still had the pain after the appointment, and she could not recall if she was prescribed medication.

¶ 51 On redirect examination, A.P. testified that she went to the twins' bedroom rather than tell Melissa because she "thought that they wouldn't say anything to anybody." She feared not being believed if she told someone, and thus she also did not tell her aunt or brother the next morning. A.P. had not spoken with defendant since the incident and he had not apologized to her.

¶ 52                                    2. Alondra

¶ 53 Alondra testified that she and Alejandra are twins and were 16 years old as of trial, Melissa is their younger sister, they are the daughters of defendant and Nelida, and A.P. was their 13-year-old cousin. Her family had a party on Halloween 2014, with Alondra's parents hosting, no other adults present, and cousins and friends attending. After the party, A.P. slept over in Melissa's bedroom while Alondra slept in the bedroom she shared with Alejandra. At some point in the night, A.P. came into Alondra's bedroom and woke her, crying and saying that defendant had touched her. Alondra told her to go back to sleep and that she had been dreaming; A.P. acknowledged that it may have been a dream. Alondra told A.P. to sleep in her room, and she did. At one point, A.P. remarked that she felt defendant's nail, without further explanation.

¶ 54 When asked if she recalled stating in a May 2015 interview that A.P. said defendant placed his finger inside her vagina and she felt his fingernail, Alondra maintained that A.P. mentioned feeling defendant's nail but not where she felt it. Alondra acknowledged watching video of that

interview before trial but maintained that she did not recall saying that A.P. had said defendant placed his finger in her vagina and she felt his fingernail.

¶ 55    On cross-examination, Alondra testified that Alejandra was asleep until "she got mad because [A.P.] woke her up and she just said go to sleep." To the best of Alondra's knowledge, A.P. did not tell Alejandra about what happened that night. A.P. had not mentioned defendant squeezing or touching her breasts. When asked if she told A.P. that it "wasn't true" and she had been dreaming because she did not trust A.P., Alondra denied it and explained that she believed A.P. had a nightmare, not an actual experience. Since then, Alondra and A.P. "don't really talk about it," although "sometimes like we bring it up." Alondra explained that when A.P. attended therapy "recently," she would ask A.P. if "she was good," and A.P. would ask how defendant was.

¶ 56    On redirect examination, Alondra testified that A.P. had said she was unsure if she was dreaming. She could not recall A.P. saying later that she was sure the incident happened. When asked if she had said in her videorecorded statement that A.P. said she was sure, Alondra replied that A.P. was sure at first and then unsure. Alondra testified to still being "close" to A.P.

¶ 57                                          3. Sandra

¶ 58    Sandra, A.P.'s mother, testified that defendant was her brother-in-law and identified him at trial. In October and November of 2014, her family and his family saw each other often. On Halloween 2014, Sandra brought A.P. to defendant's home for a party and sleepover. Sandra did not attend but picked up A.P. the next day. In April 2015, she and A.P. were tickling each other when A.P. said not to touch her body. Sandra told her, as she had before, "to never let any uncles or father or anybody touch" her. Crying, A.P. then said that her godfather, defendant, had touched her. Sandra asked her for details, and she replied that defendant

"had shut the TV in the living room off and he went to their room, to her and Melissa's. Then he went in and lay down on the bed where the two of them were at. And that he took off her bra and started to touch her breast *** and then she said that he put his hands in her vagina."

Sandra asked why she did not tell defendant's wife, Sandra's sister, and A.P. replied that she was "very scared" when defendant was hurting her. After defendant left the bedroom, A.P. went to the twins' bedroom and "told the twins that the father had been touching her."

¶ 59　Before A.P. reported the incident to Sandra, A.P. got along well with defendant. She was not in trouble at home or school when she reported the incident. She had not told anyone before that day because she was scared. That day, Sandra took her to a medical office, where Dr. Castro-Caballero saw her, because she said "her part was hurting her."

¶ 60　On cross-examination, Sandra testified that A.P. first told her what happened on Halloween 2014 and later, when they went to pick up A.P's report card, mentioned being in pain. She was in the room when Dr. Castro-Caballero spoke with A.P. but could not remember when A.P. said the pain began. Dr. Castro-Caballero told her to return in a week, and she did so. Sandra could not recall if A.P. said in this second visit that she still had vaginal pain. She also did not remember if A.P. was prescribed medication.

¶ 61　On redirect examination, Sandra testified that A.P.'s grades were good on the day she reported the incident and picked up her report card.

¶ 62　　　　　　　　　　　　4. Dr. Castro-Caballero

¶ 63　Dr. Yesenia Castro-Caballero testified to examining A.P. on April 16, 2015, and to having examined her twice before then. A.P. was brought in by her mother on a report of vaginal pain.

A.P. said that she had the pain for about a day and, when asked if anyone had touched her inappropriately, said that her godfather had touched her vagina with his finger and touched her breasts on Halloween at his home. She cried while it was happening, the other people in the home were sleeping at the time, and she told her cousins afterward. Her godfather had not done anything with his penis. A.P. was shy when answering Dr. Castro-Caballero's questions that elicited this account. Her mother was present during the questioning and seemed to be in shock, with her mouth open. Dr. Castro-Caballero told A.P. that she had to report the matter to the Department and then asked to examine A.P.'s "private area." She did so and then prescribed antifungal medication. She scheduled a followup visit, which happened about a week later. A.P. still had vaginal pain at that time, and Dr. Castro-Caballero examined her again but made no new prescription. In another followup visit about a month later, she examined A.P. again and prescribed different antifungal medication. A.P. spoke of what her godfather had done only in the first visit, and Dr. Castro-Caballero asked her about what he did to help form a diagnosis to treat her.

¶ 64    On cross-examination, Dr. Castro-Caballero testified that A.P. said her godfather abused her only once. A.P. mentioned her godfather touching her vagina with his finger but not inserting his finger inside it. In her examinations of the exterior of A.P.'s vagina only, Dr. Castro-Caballero saw no scratches, tears, or lesions but did see redness, possibly due to an infection. The medication she prescribed was for an infection. She never examined the interior of A.P.'s vagina.

¶ 65    On redirect examination, Dr. Castro-Caballero explained that she could not be certain what caused A.P.'s redness but it could have been caused by what she said her godfather did to her. On recross examination, she testified that "[y]ou can't say for sure" that the redness was caused by an infection on one hand or the described incident about six months earlier on the other hand.

¶ 66                          5. Marilyn Soto and A.P.'s Interview

¶ 67     Marilyn Soto testified that she worked for the Children's Advocacy Center as a bilingual forensic interviewer, which entails interviewing children who are suspected of being the victims of abuse or witnesses of abuse and providing "a safe environment for children to tell a story if something happened to them." Such interviews are called forensic interviews or victim-sensitive interviews, and they are conducted with only the child and interviewer in the room but are videorecorded. Others, such as police detectives and Department officials, can view the interviews from behind a mirrored window. Open-ended questions are asked to "allow the child to tell the story," rather than providing the child information or prompting particular answers. As of May 2015, when she interviewed A.P., Soto had conducted over 600 such interviews. Before trial, Soto viewed the video of A.P.'s interview and found it accurately depicted the interview.

¶ 68     The video of Soto's May 2015 interview of A.P. was shown in open court, without defense objection. Soto told her that she was not, and would not be, in trouble for anything she said in the interview and that she should tell the truth and feel free to ask for clarification of questions and to correct any misstatements by Soto. After stating that she was nine years old and discussing school, A.P. said she was being interviewed because "Uncle Willie was touching me around." A.P. was sleeping in her cousin Melissa's bed with Melissa on Halloween, when A.P. was seven or eight, because she had been at her aunt's home for a Halloween party. He came into the bedroom; she knew it was him despite the lights being off due to his height. As Melissa slept, he took off A.P.'s pants and underwear and touched her "p***," putting his finger in "the hole" and moving it around. Then he "pushed it in and it hurt a lot," did that again, pulled her underwear back on, removed her bra, touched her breasts so that they hurt, then put her bra back on and left the room. He said

nothing but breathed heavily during the incident, and he sang and drank after leaving the room. It happened only once, he did not touch her with anything but his finger, he never took his clothes off, and he did not touch his own body during the incident. A.P. said nothing during the incident.

¶ 69    Nobody was outside the room when this happened. Others were in the home, including her brother Erik, her aunt, and cousins Alondra and Alejandra. Erik, Alondra, and Alejandra were in another bedroom. A.P. went to that bedroom after the incident and told Alondra what her father had done, but Alondra said it was not true. Alejandra was asleep. A.P. then stayed in that bedroom. A.P. told Erik when she told her mother: on the day she and her mother picked up her report card and went to a doctor because her "p***" hurt. A.P. also told seven-year-old Valeria before she told her mother.

¶ 70    Soto testified that she also interviewed Alondra regarding A.P. When she asked Alondra for the specifics of what A.P. told her on Halloween, Alondra provided them. A brief portion of Soto's interview of Alondra was played in open court, without defense objection, after Soto confirmed she viewed the video before trial and found it accurate. Defense counsel then objected that the video was not impeaching. The State noted that Alondra testified to not remembering that A.P. said defendant put his finger into her vagina and she felt his nail. The court overruled the defense objection, finding that the State could perfect its impeachment of Alondra with the video.

¶ 71                            6. Defendant's Interviews

¶ 72    Detective Emily Rodriguez testified by stipulation that defendant was arrested on August 17, 2015, at about 2:30 p.m. and was not interviewed about this case until about 8:15 p.m., when she and another detective interviewed him in Spanish. Between his arrest and interview, defendant had access to a bathroom and was offered water. At the beginning of the interview, defendant was

informed of his rights to remain silent and have an attorney present, and he responded that he understood his rights and was willing to be interviewed without an attorney present. The interview lasted until about 9:30 p.m. and was videorecorded, and Detective Rodriguez would testify that defendant was not interviewed outside the recorded interview room. At the end of the interview, defendant was able to use the restroom, offered water and food, and provided a mattress to sleep if he chose. The parties stipulated that a proper foundation existed and a proper chain of custody was maintained for the interview video.

¶ 73    The video of defendant's August 17, 2015, interview was played in open court. Defendant was not handcuffed and was seated on a long bench in an apparently windowless room that also had a mattress on the floor. After he gave his name and the two detectives (Detective Rodriguez and a man) introduced themselves and engaged in some "small talk," the male detective told defendant that he had the right to remain silent, anything he said could be used against him in court, he had the right to an attorney, and the court would assign him one if he could not afford one. Defendant replied to each of these rights that he understood it. He then said that he was told "that I had touched a girl,"[1] specifically, A.P., his niece, "and that is a lie." "Supposedly, they said *** three or four times," and that she had told a doctor that he touched her private parts. He was not told where it allegedly happened, but she had visited his home, and he knew that others including his wife and daughters knew of her allegation. He told the detectives that he had hearing issues because he had been in three accidents: a vehicle accident, a slip-and-fall, and a work incident. While denying that his accidents were the result of drinking, he admitted to giving up drinking about three months prior. When he drank, he did not drink to the point of memory loss.

---

[1]The interviews were in Spanish, and the quotes are from English captioning added to the videos.

¶ 74    Defendant said that his daughters told him of the allegation, saying that "we were there." When he said that the detectives could ask his daughters, the male detective noted that his daughters had already been investigated. Defendant had not seen A.P. for over six months. The detective told him that A.P. had "told people right away" and "even told your daughters." He described to defendant a victim-sensitive interview, including that they are recorded. When he suggested that defendant made a drunken mistake, defendant replied that A.P. is his niece and goddaughter but people would believe her over him because she is a child. The detective suggested that defendant made a one-time mistake due to being drunk so that "you are not a bad person that does that with young girls," and that it would be better for him to "tell us right now before things get bigger." Defendant denied again that it happened. The detective reiterated that interviews had already been conducted, again suggested that it would be "a mistake" if he was "a little drunk" but "we can prove it happened," and urged him to "feel the weight off your back" from "being honest."

¶ 75    The detective told defendant that, whether he talked or not, "we are still charging you for what happened," but the judge would ask him why he did not take the opportunity to give his account of events and consider it in sentencing either leniently for making a mistake or less leniently for "a bad person." Defendant again denied touching A.P. He said that his family no longer visited him because they believe A.P. When asked if she was lying, he answered, "I don't know honestly." The detective reiterated that he was going to be charged and end up "in front of a judge" but if he talked the judge would know it was a mistake or the result of drinking. Defendant denied intending or wanting to have sex with A.P. but noted that people believe her. The detective told defendant that he could prove there was contact but only defendant could explain it. Defendant denied that A.P. said he was hurting her, then said "I didn't do it" but did not know why A.P. said

it happened. The detective argued that a girl A.P.'s age would not have sexual experience, but A.P. described in detail what defendant did to her so that "we can prove it in court."

¶ 76    When defendant again denied touching her, the detective sat down next to him and, slapping one hand against the other for emphasis, reiterated that A.P. told defendant's daughters what he had done and had given an account with details she would not know at her age. Defendant replied that he was not calling A.P. a liar but did not know why she accused him. The detective asserted that he knew what happened—but only defendant could explain why it happened—and urged defendant to "talk about the truth." He asked defendant if a person with physical or emotional problems who therefore makes a mistake should go to jail or receive help; defendant answered that he should receive help. The detective urged him to take the opportunity to help solve his problems by giving his account and explaining that he is a good man who made a mistake.

¶ 77    Defendant asked what the detective recommended, and he replied that he was not making any recommendation but was merely providing him the opportunity to tell his side of events. He told defendant that he would not force him to say anything but, again, merely providing an opportunity to talk. Defendant denied touching A.P. and said "I just want you to let me go and if I have to go and seek for help or whatever it's needed then I'll go." The detective replied that he was not going to let defendant go and reiterated that he would be charged based on A.P.'s account, which would be more believable because she is a child and had not changed her account from the beginning. Defendant said that what the detective said "doesn't make sense" and again asked to be released to be with his wife and return to work. The detective told him again that he would not be released but charged. His case was in his hands because, while A.P.'s account was clear, he could affect the outcome if he would "stop lying." If he asked for clemency from the judge, the

judge would ask him why he did not admit his mistake earlier. The detective said that, while he could not vouch for what the judge would do, "in similar cases when it was a first time that a mistake was made usually they have the tendency to try to help the family."

¶ 78    Detective Rodriguez then told defendant that he would "have to be honest with us about what happened" if he wanted them to understand it was a mistake. "If you are a person who is going to do this again with another girl or a boy, we don't believe [so] but how can we believe a person if the person is not being honest." She said that his "daughters confirmed everything" and noted that he had no problems with A.P. earlier, and that it was "in your hands to fix things and try to [explain] why this happened." Defendant said that he felt bad that nobody would talk with or visit him because of what they believed he did but "I didn't do anything to her." Detective Rodriguez replied that "we know that it happened" from A.P.'s credible account but "only you know the answer why these things happened," so they were giving him the opportunity to explain.

¶ 79    Defendant said that he would go to court but would like to be released in the meantime to go to work "to pay you." The detectives replied that they were not asking to be paid but merely doing their jobs, noting "you are not in Mexico where they try to buy the authorities." Defendant said that he was not trying to offend them or offer them money. The male detective suggested that defendant had just made a mistake like his mistake with A.P. and asked if he went to school. Defendant replied that he went to school for about 10 years, so "not much," but enough that he was not illiterate. The detective reiterated that A.P. gave a credible account and told defendant's daughters on the day it happened, so he would face charges whether or not he gave his account, but he could take the opportunity to clarify what happened.

¶ 80    Defendant asked if he would be in front of a judge "tomorrow," and the male detective replied that he could still be at the police station the next day due to "paperwork" but "there will be consequences *** if you keep saying that nothing happened when everybody is saying that something happened" and "who do you think the judge is going to believe?" He asked if defendant had "done that with other kids," and defendant replied that "I have never done it." Defendant again said that they would believe A.P. over him because she is a child. The detective agreed, noting that A.P. mentioned the incident "immediately" and her account was consistent, which it would not be if she was lying. Defendant could explain that his actions were a mistake or the result of intoxication, he again suggested. Detective Rodriguez also said that only defendant could explain "what was going on in your head" and that he was a good person who made a "stupid mistake." Defendant said he was a good person, and she answered that "we need to know the whole truth because if not we have to go with what the girl says." Defendant said he was telling the truth, and she said he was not telling the whole truth because he knew what happened and why. The male detective said "what I see in you is that sometimes when you are stressed out you don't think well" and that they already knew and could prove what happened but only defendant could explain why.

¶ 81    The detective asked defendant if he wanted water for his cough. Defendant said "later" and that he had phlegm from a cold, adding that he cannot sleep when he is nervous. When the detective asked if he was nervous at that moment, he replied that he was "a little" nervous all the time because he was sad. The detective asked why he touched A.P., and he again denied touching her. He was not accusing her of lying but did not know why she was accusing him. The detective told him they would not waste their time or force him to talk but would give him a moment to think

about whether he would tell the truth. Defendant asked to go to the washroom, and the detectives took him out of the room.

¶ 82    When defendant and the male detective returned to the room a few minutes later, he asked defendant if he wanted to give his account out of the presence of Detective Rodriguez due to embarrassment. Defendant again denied touching A.P. The detective left the room, telling defendant that he would return and he should think in the meantime. Defendant asked if he could lie down, and the detective said he could. Defendant asked if the light could be turned off and if there would be anyone he could ask to use the washroom. The detective replied, "Get some rest," and left the room. The video ended with defendant removing his boots and lying on the mattress.

¶ 83    Detective Lisa David testified that, after viewing the video of defendant's interview of August 17, 2015, she and another detective interviewed him in Spanish the next day. Before the interview, one of the detectives from the previous day's interview briefed Detective David about the interview and case, including that defendant had not been told the specifics of A.P.'s allegations against him. At the beginning of the interview, defendant was given *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and then agreed to be interviewed. Detective David denied that any threats or promises were made to defendant. He was not told that he could avoid being charged by being interviewed, and indeed was told that he was being charged. During an interview of about a half-hour, he initially denied any wrongdoing regarding A.P. but then made admissions. He was not interviewed or interrogated outside that half-hour and the previous day's interview of about an hour and 15 minutes. After the interview of August 18, 2015, the investigation was concluded and defendant was charged. Detective David viewed video of the August 18 interview before trial and

found it to be a fair and accurate depiction of the interview. The video was entered into evidence and played in open court.

¶ 84    At the beginning of the video, defendant was sitting in a similar room to the previous day's video, except there was no mattress visible and there were two chairs in addition to the bench. A male detective entered and removed defendant's handcuffs, and Detective David entered and sat down. Detective David asked defendant if he slept, and he said he did not but merely closed his eyes. The male detective stated that defendant was offered food but did not like it, and defendant confirmed that he did not like sandwiches. He agreed that he was in "a place with a bathroom" "downstairs" overnight. The detective told defendant that they were going to discuss the same matter as on the previous day but he would first read him his rights. He told defendant that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to an attorney, and that the court would appoint one if he could not afford one. Defendant replied to each right that he understood it.

¶ 85    Defendant then acknowledged that they were there to discuss A.P., "that they are saying that I touched her and that is a lie." The male detective said that he spoke with some people since the previous day and found out "you are a little stubborn, they had told you not to do those things and you do them," and that defendant's denials did not mean the allegations could not be proven. A.P. "told them immediately, that same day what happened." He reminded defendant that he said he does not drink to the point of memory loss so "I don't want you to tell me that you don't remember." He suggested that defendant admit his "stupid mistake" to "move forward" with his life. He then asked defendant why he touched A.P. as she alleged, and he replied "I don't remember." The detective insisted that he could remember, but did not want to admit it, and that

his daughters said he was not "crazy" and did not have memory loss but was "a punisher" who liked "to control your family" and was "not a bad father but you go too far when it comes to discipline your family." Defendant said that he does forget things. When asked if he forgot what happened with A.P., he replied that "I really don't remember honestly that I have done that." The detective asked rhetorically how he could "not remember if it was your niece" and goddaughter. A.P. had described what he did, but he could take the opportunity to admit that it was a mistake and not "let things get bigger." The detective suggested that defendant did it under the influence of alcohol because he was still drinking then and said that he (the detective) had been an alcoholic who made mistakes while drunk but did not forget what he did.

¶ 86    The detective then asked defendant to explain why he did it, and defendant answered, "I thought it was my wife but it was not." He asked the detectives to "take the charges away" and admitted feeling sad and ashamed. When asked if he felt better for telling the truth, he replied that they were "going to lock him up either way." When asked if he had been confused due to alcohol, he replied that it was night. A.P. was sleeping in his daughter's room, but his wife sometimes slept in different rooms. Everyone else was already in bed. He denied being drunk that night. When he got up to use the washroom, he went to another bedroom to find his wife but she was not there, so he went to the other bedroom and "thought it was [my] wife." He did not "f***" her but used his finger in her vagina "a little" and "rub[bed] her the way you rub your wife." He left when he realized from the lack of hair that she was not his wife.

¶ 87    Against the detective's repeated question as to whether A.P. had said anything during the incident, defendant maintained that she had not spoken. The detective demanded that he look at his fingernails, and he admitted they were thick. When asked if she told him that she felt his nails,

he reiterated that she said nothing. He was not certain she was in Melissa's bedroom but was certain she was not alone in the room. He expressed regret for making a stupid mistake and a desire to apologize to A.P.'s parents. He "put[ ] the finger inside" only once. When asked when he realized he made a mistake, he said he realized the next morning when he found A.P. in the other bedroom. The detective clarified that he meant when he realized the person he was touching was not his wife, and he reiterated that it was when he felt no pubic hair. He denied touching A.P.'s breasts. His wife had large breasts, but he never felt A.P.'s breasts, so he would not have realized the difference. When asked why he did not admit his mistake to his wife when she asked, he replied that he was embarrassed. He also denied the allegations during the previous day's interview out of embarrassment. The detective asked defendant if he needed to use the washroom or wanted a bottle of water; he declined the washroom but wanted water. Defendant asked if he was "going to stay here again," and the detective replied that he would be there "for a little bit." The video ended.

¶ 88                     G. Further Proceedings

¶ 89    After the State rested its case, the defense unsuccessfully moved for a directed verdict. Following admonishment of his right to testify and that only he could waive that right, defendant chose not to testify and the defense rested.

¶ 90    Following closing arguments and jury instructions, the jury found defendant guilty of predatory criminal sexual assault and aggravated criminal sexual abuse.

¶ 91    Defendant filed a posttrial motion arguing, in relevant part, insufficiency of the evidence and that he was "deprived of a fair trial by an impartial jury." It raised no issues with his section 115-10 hearing or admission of his postarrest statements. At the motion hearing, the defense stood on its motion, the State made essentially no argument, and the court denied the motion.

¶ 92 Defendant's September 2019 presentencing investigation report (PSI) was essentially unchanged from his February 2018 PTI, except that he had not been employed or seen his wife and daughters since his arrest and he claimed various physical health issues while he had claimed good physical health in his PTI.

¶ 93 Following a sentencing hearing, the court sentenced defendant to consecutive prison terms of seven and three years for predatory criminal sexual assault and aggravated criminal sexual abuse respectively. This appeal followed.

¶ 94                                    III. ANALYSIS

¶ 95 On appeal, defendant contends that the trial court erred when it failed to ascertain from potential jurors that they understood and accepted his right to not present evidence, as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). He also contends that the court erred by viewing a recording of A.P.'s interview under section 115-10 outside defendant's presence without first obtaining his knowing and intelligent waiver of his right to be present and by admitting the interview into evidence without publishing it. Lastly, defendant contends that trial counsel rendered ineffective assistance by not filing and arguing a motion to suppress his statements.

¶ 96 We shall address these contentions in a different order: the court viewing A.P.'s interview video for section 115-10 purposes outside defendant's presence, counsel not arguing a motion to suppress defendant's postarrest statement, and lastly the *voir dire* issue regarding Rule 431(b).

¶ 97                      A. Defendant's Viewing of A.P.'s Interview

¶ 98 Defendant contends that the court erred by viewing a recording of A.P.'s interview under section 115-10 outside defendant's presence without obtaining his knowing and intelligent waiver of his right to be present and by admitting the interview into evidence without publishing it.

¶ 99    As a threshold matter, we note that defendant did not object to the trial court viewing A.P.'s interview video outside his presence either during the section 115-10 hearing or in his posttrial motion. A claim not raised by objection and preserved in a posttrial motion is forfeited. *People v. Mudd*, 2022 IL 126830, ¶ 21. This court will consider a forfeited error if it is plain error; that is, if a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice or (2) the error was so serious that it alone affected the fairness of the proceedings. *Id.* ¶¶ 21-22. In considering a claim of plain error, we may first determine whether error occurred. *Id.* ¶ 22.

¶ 100   "In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13," for various offenses including the offenses charged herein, the court may admit into evidence as an exception to the hearsay rule:

> "(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another; and

> (2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a) (West 2018).

The evidence is admissible only if the child testifies at trial or is unavailable to testify, and the alleged act is corroborated, and the "court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b).

¶ 101 "The purpose of this hearsay exception [in section 115-10] is to alleviate concerns that at trial very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse or might be psychologically impeded from doing so." *People v. Foster*, 2020 IL App (2d) 170683, ¶ 28. In conducting a reliability determination, the court evaluates the totality of the circumstances surrounding the child's making of the statements, considering factors such as the child's spontaneous and consistent repetition of the incident, mental state, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *People v. Burgund*, 2016 IL App (5th) 130119, ¶¶ 242, 247.

¶ 102 A criminal defendant has the right to be personally present at critical stages of the proceedings against him or her if his or her presence would contribute to the fairness of the procedure. *People v. Lofton*, 194 Ill. 2d 40, 67 (2000). Conversely, the right to be present is not absolute, and a defendant's absence from even a critical stage of the proceedings will not constitute error unless it caused the proceeding to be unfair or the defendant's absence resulted in a denial of an underlying substantial right, such as the right to confront witnesses, present a defense, or be tried by an impartial jury. *People v. Lindsey*, 201 Ill. 2d 45, 56-57 (2002). While a defendant's right to be present at trial generally does not encompass the argument of pretrial motions, a defendant has the right to be present whenever his or her presence bears a reasonably substantial relationship to having a full opportunity to defend against the charges, even where the defendant is not actually confronting witnesses or evidence against him. *Lofton*, 194 Ill. 2d at 66.

¶ 103 In *Lofton*, where the defendant was not present for the section 115-10 hearing (*id.* at 71), our supreme court stated:

"In light of the entire record, we cannot say that there is nothing defendant could have done had he been present at the section 115-10 hearing and nothing he could have gained [citation]. Numerous details, possibly disadvantageous to the State's position, about precisely how [the child] came to accuse the defendant were elicited at trial at which defendant was present, whereas virtually none were elicited at the section 115-10 hearing the day before from which he had been absent. Even if, as the State maintains, defendant did lack direct knowledge of the hearsay statements in question or how they came to be made, we are mindful that this is an intrafamilial incident, information about which defendant might well have obtained through one or more members of his family. The record suggests that defendant's presence at the section 115-10 hearing would have contributed to his ability to defend himself against the charges ***." *Id.* at 71-72.

The *Lofton* court therefore found that,

"[b]ecause the record indicates that defendant's presence at the section 115-10 hearing would have contributed to the fairness of the criminal proceeding against him and that a fair and just hearing was thwarted by his absence, we conclude that the section 115-10 hearing was a stage critical to the outcome of the criminal proceeding at which defendant had a right to be present." *Id.* at 72-73.

In *Lindsey*, the supreme court warned that a defendant cannot rely on broad principles not adapted to the specifics of his or her case but must establish, in light of the entire record, that the fairness of his or her proceedings was affected by his or her absence. *Lindsey*, 201 Ill. 2d at 57-58.

¶ 104    In *People v. Lucas*, 2019 IL App (1st) 160501, ¶¶ 4-7, where a defendant was convicted in relevant part of driving under the influence, the trial court viewed video of her traffic stop in

chambers, without defense objection, and stated that it relied at least in part on the video in finding the defendant guilty. This court found second-prong plain error (*id.* ¶ 21), holding that the defendant's "absence from the video viewing affected the trial's fairness because she was unable to view the evidence against her and aid in her own defense." *Id.* ¶ 14. "The presentation of evidence at trial is undoubtedly a critical stage of the proceeding, and here, the video of the traffic stop involved a significant portion of the evidence against" the defendant. *Id.* ¶ 15. Not only did the defendant not see the video during trial, "no evidence, let alone affirmative evidence, indicates that she viewed the video before trial." *Id.* ¶ 16. While "counsel could provide a summary of the contents of the video," for purposes of the defendant's "decision to testify or not, counsel's gloss on the evidence is no substitute for her own knowledge." *Id.* ¶ 20.

¶ 105 Conversely, where a "defendant was present in court for the section 115-10 hearing, including the testimony of multiple live witnesses," the trial court viewed video of the interviews of the child for purposes of section 115-10 in chambers, but those videos were played at trial in the defendant's presence, the "defendant was able to view all of the State's evidence against him at trial, and his decision regarding his right to testify was not impacted." *People v. Richardson*, 2021 IL App (1st) 190821, ¶ 53. The *Richardson* court distinguished *Lofton*, where

> "the defendant was not present for any portion of the section 115-10 hearing, and the supreme court was not asked to consider the issue before us now. Significantly, in reaching its conclusion, the supreme court specifically made its ruling based on the record of that case. Thus, each case should be considered on its own record. In contrast with *Lofton*, nothing in the record suggests that defendant's presence while the trial court reviewed the recorded interviews would have impacted his ability to defend himself ***." *Id.* ¶ 54.

¶ 106    Similarly, in *People v. Martinez*, 2021 IL App (1st) 172097, ¶ 69, a defendant claimed that the trial court violated his right to be present by viewing a victim-sensitive video in chambers. This court denied that claim, finding that "[d]efense counsel confirmed on the record that defendant had viewed the video in his presence." *Id.* Thus, "[u]nlike *Lucas*, defendant was thus aware of all the evidence against him prior to exercising his right to testify," and "the court's private viewing of the video in chambers did not impact the fairness of defendant's trial or violate any of defendant's substantial constitutional rights." *Id.*

¶ 107    Defendant cites *People v. Flagg*, 2021 IL App (1st) 191692-U, as persuasive authority. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021). In *Flagg*, a defendant contended that the trial court violated his right to be present when it viewed video of a victim-sensitive interview in chambers during trial, while the State responded that the defendant forfeited the claim and that viewing the video was not a critical stage. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 44. "The record shows that the trial court did not view the video during the section 115-10 hearing, where defendant was present, and then viewed the video in chambers at trial." *Id.* ¶ 49. This court found that the record also did not establish that the defendant saw the video outside of court, where his pretrial statement that his attorneys "sped through" a video did not specify which video, defense requests to bring a laptop into prison to review video evidence did not establish that the visits actually occurred, and the provision of a summary of the victim-sensitive interview to the defense did not establish that the defendant read it. *Id.*

> "Based on these facts, we find that the court erred by viewing the [victim-sensitive interview] video in chambers rather than playing it in open court in defendant's presence,

and this error constituted second prong plain error because it denied defendant his constitutional right to be present at all critical stages of proceedings." *Id.* ¶ 51.

This court rejected the State's argument that in-chambers viewing of the video was not a critical stage because the other evidence of the defendant's guilt was strong, stating that "the strength of the other evidence does not impact our analysis here" and is not part of the analysis of a second-prong plain error claim. *Id.* ¶ 55.

¶ 108    Here, we cannot conclude that defendant was deprived of his right to be present at critical stages of the proceedings or his right to view the evidence against him before deciding whether to testify. As we find no error, there can be no plain error.

¶ 109    The record is clear that the video of A.P.'s interview was shown at trial, where defendant was present and had translation via headphones. Thus, defendant saw and heard the evidence at issue before he had to decide whether to testify. This case is distinguishable from *Flagg* and *Lucas*, where, in both cases, the record did not establish that the defendant had ever seen crucial video that the trial court viewed in chambers during a bench trial. *Lucas*, 2019 IL App (1st) 160501, ¶ 16; *Flagg*, 2021 IL App (1st) 191692-U, ¶ 49. Stated another way, this case is substantively identical to *Richardson*: defendant was present for the section 115-10 hearing, the court viewed video of the child's interview for section 115-10 purposes in chambers, and the video was shown at trial. *Richardson*, 2021 IL App (1st) 190821, ¶ 53.

¶ 110    Moreover, unlike *Flagg* where this court found "insufficient indication in the record for us to conclude that [the defendant] ever saw" the victim-sensitive interview (*Flagg*, 2021 IL App (1st) 191692-U, ¶ 51), there is evidence here that defendant saw A.P.'s interview video before trial. Counsel was not merely granted a court order to bring video to jail to show defendant, which

this court found insufficient in *Flagg*. *Id.* ¶ 49. Counsel told the court in March 2019, months before trial, that his associates went with a Spanish interpreter to show the videos pursuant to the court's order to allow viewing of the statements of both A.P. and defendant. This case is therefore similar to *Martinez*, where "counsel confirmed on the record that defendant had viewed the video" and "was thus aware of all the evidence against him." *Martinez*, 2021 IL App (1st) 172097, ¶ 69.

¶ 111                          B. Ineffective Assistance

¶ 112   Defendant contends that trial counsel rendered ineffective assistance by not filing and arguing a motion to suppress his statements.

¶ 113   To demonstrate ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant; that is, there is a reasonable probability of a different outcome to the proceedings absent the deficient performance. *People v. Johnson*, 2021 IL 126291, ¶ 52. We review *de novo* whether a defendant was deprived of effective assistance of counsel. *Id.*

¶ 114   Whether to file a motion to suppress is generally a matter of trial strategy entitled to great deference. *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 21. Because a court will not find defense counsel ineffective for failing to file a meritless motion to suppress, a claim that counsel was ineffective for not filing a motion to suppress requires this court to determine, on the record before it, whether such a motion would have been meritless. *Id.*

¶ 115   In conducting that analysis, this court may consider information in a PSI "for the limited purpose of speculating about what additional evidence the State might have presented if defendant had filed a motion to suppress." *Id.* ¶ 34. A PSI is "an example of information possibly (or even probably) known to defense counsel, which may explain why counsel did not file a motion to

suppress." *Id.* ¶ 36. Illinois courts have acknowledged the difficulty of ruling on an ineffectiveness claim for failure to file a motion to suppress resulting from a record developed for trial, rather than a motion to suppress, and have recognized the general preferability of presenting such a claim in a collateral petition where the record can be developed for the purpose. *Id.* ¶ 37.

> "This is not to say that an argument on direct appeal that trial counsel was ineffective for not filing a motion to suppress can never be successful. However, it would be quite rare for a record on direct appeal to affirmatively establish that counsel did not file a motion to suppress because of counsel's error of judgment or understanding." (Emphasis omitted.) *Id.* ¶ 38.

An example of a successful direct appeal claim is one based on a *Miranda* violation apparent from the direct appeal record. *Id.* ¶¶ 38-39.

¶ 116    The essential elements of the warning required to be given to a defendant in custody before questioning are that the defendant must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Stated another way, a defendant in custody

> "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

¶ 117    "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *California v. Prysock*, 453 U.S. 355, 359 (1981) (*per curiam*). In other words, verbatim

recitation of the language in *Miranda* is not required. *Id.* at 360. The key question in determining whether a defendant was adequately informed of his right to the presence of appointed counsel prior to and during interrogation is whether "the reference to the right to appointed counsel was linked with some future point in time after the police interrogation," which would be improper. *Id.* Thus, where "nothing in the warnings given *** suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general," the requirements of *Miranda* have been met. *Id.* at 360-61. The Supreme Court has reiterated that "[w]e have never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989).

¶ 118   Citing *Prysock*, this court has noted that "Illinois courts have already considered the claim that defendant's *Miranda* rights were defective when the defendant was not specifically advised that he had the right to have an attorney present before and during questioning." *People v. Macias*, 2015 IL App (1st) 132039, ¶ 45; *People v. Walton*, 199 Ill. App. 3d 341, 343 (1990); *People v. Martinez*, 372 Ill. App. 3d 750, 754 (2007).

"Defendant admits that the holdings in *Walton* and *Martinez* are contrary to his argument, but asks this court not to follow these decisions because they are counter to the Supreme Court decisions in *Miranda*, *Prysock*, and *Duckworth*. We disagree with defendant and find the decisions in *Walton* and *Martinez* adhere to the Court's position that *Miranda* rights do not have to be precisely recited, but must 'reasonably convey' a defendant's rights. Such was done in this case. Defendant was advised that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to an attorney, and that if he could not afford an attorney, one would be appointed for

him. As the courts in *Walton* and *Martinez* found, the failure to include that the defendant could have an attorney present before and during questioning does not render *Miranda* rights fatally defective." *Macias*, 2015 IL App (1st) 132039, ¶ 50.

¶ 119    A conviction based in whole or in part on an involuntary confession violates a defendant's constitutional rights. *People v. Hughes*, 2015 IL 117242, ¶ 31. The test of voluntariness is whether the defendant made his or her confession freely and voluntarily, without compulsion or inducement of any kind, or whether his or her will was overborne at the time of the confession. *Id.* Courts weighing the voluntariness of a confession consider the totality of the circumstances, with no single factor being dispositive. *Id.* Considerations include the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; the duration and legality of the detention; and whether there was physical or mental abuse, including threats or promises. *Id.*

¶ 120    Here, trial counsel filed and amended a motion to suppress claiming that defendant's postarrest statements should be suppressed because of inadequate *Miranda* warnings and because defendant's will was overcome and his statements rendered involuntary by "psychological and mental coercion," "direct and indirect promises and threats," and "harassing and coercive interrogation tactics." However, counsel then did not present or argue the motion. The trial evidence regarding defendant's postarrest statements consisted of videos of the statements themselves and the stipulated and live testimony of detectives concerning circumstances of defendant's arrest and interviews.

¶ 121    As to the *Miranda* warnings, defendant acknowledges that he was told in Spanish of his rights to remain silent, to have an attorney, and to have one appointed if he could not afford one.

However, he argues, he was not told specifically that he could have counsel present during questioning or that he could stop the questioning at any time. This court rejected such a proposition in *Macias*, and we see no reason in light of *Prysock* to hold otherwise.

¶ 122    Turning to the voluntariness of defendant's postarrest inculpatory statement, defendant points to his relative lack of education; relative lack of a criminal record and, thus, inexperience with the criminal justice system; and physical and mental ailments.

¶ 123    As to defendant's education, he attended school through the sixth grade and he denied being illiterate. As to his health, he had depression but the PTI indicates that it was diagnosed months before his arrest and he was receiving treatment and medication. He also claimed hearing issues from multiple accidents and a cold that caused a buildup of phlegm, but in his PTI he claimed good physical health and prearrest physical activities including running and playing soccer. While he was not in his best shape on the days he was questioned, nor was he particularly well-educated, we believe neither rises to the level of establishing that his will was overwhelmed or he was particularly susceptible to pressure.

¶ 124    As to defendant's inexperience with the criminal justice system, we note that he asked more than once to be released or allowed to go home. However, while the detectives emphasized the mitigating effect of a confession, they repeatedly told him that he was facing charges and would end up in court whether or not he confessed, and defendant acknowledged it. We also note that defendant made a remark about returning to work so he could pay the detectives. As this brief remark could be no more than an offhand reference to paying his taxes from which public employees such as the detectives are paid, we give it little weight either way. While defendant notes that trial counsel said at one point that defendant did not understand the charges against him,

a BCX a few months after his arrest found him fit to stand trial, including his awareness of the charges against him.

¶ 125  Counsel notes defendant's remarks at the beginning of the second interview that he "failed to sleep the night before and could not eat any food." However, the interview video and evidence from the detectives tend to show that this was not the result of deprivation by the police. Defendant was given the opportunity to sleep, as shown by the mattress in the interview room and the reference to being placed between the interviews downstairs where he had access to a washroom. Moreover, he also said that he closed his eyes, so that his remark that he did not sleep does not necessarily mean that he never slept. As to food, the interview video also establishes that he was offered food but declined it.

¶ 126  Defendant argues that, for the aforesaid reasons, he "could have felt that he had to go along with whatever the detectives wanted, which included eventually confessing." However, the course of the interviewing belies that defendant was pliantly telling the detectives what they wanted to hear. He spent the entire first interview on the day of his arrest repeatedly denying that he touched A.P. In the second interview, he said that he did not remember shortly after a detective told him not to say that he could not remember. Moreover, even after he admitted to touching A.P., he maintained that she had said nothing during the incident, despite a detective repeatedly asking him if she had said anything.

¶ 127  We conclude that defendant has failed to establish on this record that a motion to suppress had a reasonable probability of success. Thus, he has failed to show ineffective assistance.

¶ 128                    C. Illinois Supreme Court Rule 431(b)

¶ 129    Defendant contends that the court erred when it failed to ascertain from potential jurors that they understood and accepted his right to not present evidence, as required by Rule 431(b). He contends that the court misstated that principle when it asked the venire members if they understood and accepted that "defendant is not required to prove his innocence."

¶ 130    As a threshold matter, the defense did not object to the court's Rule 431(b) inquiries during *voir dire* or in the posttrial motion. A claim not raised by objection and preserved in a posttrial motion is forfeited and may be considered as plain error if error was clear or obvious and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice or (2) the error was so serious that it alone affected the fairness of the proceedings. *Mudd*, 2022 IL 126830, ¶¶ 21-22.

¶ 131    Rule 431 provides that, during *voir dire* examination of venire members or prospective jurors,

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 132    Rule 431(b) was adopted by our supreme court to ensure that defendants have fair and impartial juries that understand and accept the important constitutional principles described therein. *Foster*, 2020 IL App (2d) 170683, ¶ 61. Compliance with Rule 431(b) consists of the trial

court informing the prospective jurors of all four principles, asking them if they both understand and accept the principles, and giving them an opportunity to individually state or signal whether they understand and accept all the principles. *People v. Birge*, 2021 IL 125644, ¶¶ 27, 34. The "plain language of the rule *** does not require the court to explain the principles to the jurors in any particular fashion." *Id.* ¶ 34. While supreme court rules must be strictly complied with, verbatim recitation of a rule's language is not required. *People v. Gorss*, 2022 IL 126464, ¶ 29.

¶ 133 Panels of this court have reached different conclusions on the question of whether the trial court's recitation that a defendant is not required to prove his innocence correctly states the third principle in Rule 431(b): that a defendant is not required to offer or present evidence. This court has held that the trial court complied with Rule 431(b) under such circumstances. See *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 38 (and cases cited therein, including *People v. Chester*, 409 Ill. App. 3d 442, 447 (2011)). "The court's statement that 'defendant is not required to prove his innocence' would be interpreted by a reasonable jury to satisfy the third Rule 431(b) principle because if defendant is not required to prove his innocence, he has no reason to present evidence." *Chester*, 409 Ill. App. 3d at 447. This court stated to the contrary in *People v. Walker*, 2011 IL App (1st) 072889-B, ¶¶ 24, 27; and *People v. Raymond*, 404 Ill. App. 3d 1028, 1054-55 (2010). The *Raymond* court explained why it found the recitation at issue to be insufficient: "[T]here is a difference between stating that a defendant is not required to *prove* his innocence—indicating that the burden of proof is on the State—and explaining that defendant was not required to produce *any* evidence." (Emphasis in original.) *Raymond*, 404 Ill. App. 3d at 1055. In both *Walker* and *Raymond*, this court went on to find that the error did not constitute plain error. *Walker*, 2011 IL App (1st) 072889-B, ¶¶ 25-27; *Raymond*, 404 Ill. App. 3d at 1056-59.

¶ 134   An unpreserved claim of a Rule 431(b) violation is not cognizable under the second prong of plain error. *Birge*, 2021 IL 125644, ¶ 24. Instead, a defendant with an unpreserved Rule 431(b) claim must demonstrate first-prong plain error—that is, that the trial evidence was closely balanced. *Id.* Whether the evidence was closely balanced is not a sufficiency analysis but "a qualitative, commonsense assessment of the totality of the evidence within the context of the case," including evidence of witness credibility. *Foster*, 2020 IL App (2d) 170683, ¶ 52. Our review of alleged violations of Rule 431(b) is *de novo*. *Id.* ¶ 48.

¶ 135   Here, we find the trial evidence was not closely balanced, so that any error in the Rule 431(b) procedure was not plain error. A.P. testified clearly at trial to what defendant did to her on Halloween 2014 in his young daughter Melissa's bed. Defendant's daughter, Alondra, corroborated A.P.'s account that she attended a party at defendant's home on Halloween 2014, slept over in Melissa's bedroom, woke Alondra to say what defendant had done only a few minutes earlier, and stayed the rest of the night in Alondra's bedroom. A.P.'s mother, Sandra, testified that, in April 2015, A.P. gave a similar account of defendant's actions on Halloween 2014 when prompted by a visceral reaction to being touched. Dr. Castro-Caballero testified that A.P. also told her in April 2015 that, at her godfather's home on Halloween, he touched her vagina with his finger and touched her breasts. A.P. was interviewed in May 2015 and gave an account that was highly consistent with her trial testimony. Last, but certainly not least, defendant admitted to police in August 2015 that he put his finger in A.P.'s vagina during the night in a room where someone other than A.P. was present and maintained against repeated questions that A.P. said nothing during the incident, just as A.P. said in her interview and testified at trial.

¶ 136  We acknowledge that defendant initially denied touching A.P. and maintained even after his admission that he did not touch her breasts. Also, there were some discrepancies in the testimony surrounding A.P.'s accounts. However, neither the denials nor the discrepancies rise to the level of disturbing our conclusion, taking the trial evidence in its totality, that the evidence of defendant's guilt from A.P.'s credible and corroborated accounts and defendant's admission was not closely balanced.

¶ 137                                    IV. CONCLUSION

¶ 138  Accordingly, the judgment of the circuit court is affirmed.

¶ 139  Affirmed.

2022 IL App (1st) 200315

| | |
|---|---|
| **Cite as:** | *People v. Rodriguez*, 2022 IL App (1st) 200315 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-15081; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kyle R. Sullivan, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David Iskowich, and David B. Greenspan, Assistant State's Attorneys, of counsel), for the People. |